IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,
    Plaintiff,

v.                                                                No. CR-18-058-RAW

MATTHEW ARMSTRONG,
    Defendant.

### DEFENDANT'S SENTENCING MEMORANDUM
#### INTRODUCTION

This Sentencing Memorandum seeks to have this honorable Court accept the plea agreement between the parties. Doc. 270. This Memorandum contends that the concurrent life sentences along with the concurrent ten years of incarceration are appropriate under the 18 U.S.C. § 3553(a) factors and the United States Sentencing Guidelines. Doc. 270, p. 9.

#### GENERAL LEGAL PRINCIPLES

Doubtlessly this honorable Court is aware that the United States Sentencing Guidelines are "effectively advisory[.]" *United States v. Booker*, 543 U.S. 220, 244-45, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Additionally, district courts are entitled to categorically reject Guidelines "based on a policy disagreement with those guidelines." *Spears v. United States*, 555 U.S. 261, 266, 129 S.Ct. 840, 844, 172 L.Ed.2d 596 (2009) (addressing crack cocaine guidelines.). Following the correct guideline calculation, the Court then considers the Title 18 United States Code, Sections 3553(a)(1)-(7), (b)(1)

factors. 18 U.S.C. § 3553(b)(1) and Chapter 1, Part A, (4)(b) of the United States Sentencing Guidelines both allow for variances and departures from the Guidelines. The Supreme Court in *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558, 570, 169 L.Ed.2d 481 (2007) referring to 18 U.S.C. 3553(a) made clear:

> The statute, as modified by *Booker*, contains an overarching provision instructing district courts to impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing, including to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.

*Id*. 552 U.S. at 100, 128 S.Ct. at 570. After calculating the relevant guideline range and considering the necessary statutory factors, then the Court states its reasons for imposing a particular sentence. *Id*. § (c)(1)-(2). The applicable law and facts of the instant case merit accepting the plea agreement.

**I. THE RULE 11 (C) PLEA AGREEMENT SHOULD BE ACCEPTED AS A SUFFICIENT SENTENCE BUT NOT GREATER THAN NECESSARY TO ACCOMPLISH THE GOALS OF SENTENCING SET OUT IN 18 U.S.C. § 3553(A).**

This case is undeniably tragic. Ms. Owl's family has lost a mother, daughter, and sister. Matthew Armstrong's family is losing a father, son, and a brother. One life lost and the other lingering for a life sentence, however long that may be, in the Bureau of Prisons, (BOP). Although Mr. Armstrong by his plea agreement, Doc. 270, agreed to a life sentence in the BOP it is worthy of consideration what sort of life he lived before entering the BOP.

Matthew's early life was marred by abandonment and serious medical issues. Before Matthew was ten years old, he was abandoned by his mother and by his father. His mother only made sporadic appearances in Matthew's life, and he did not have contact with father until he was a teenager. Unfortunately, Matthew's grandparents did not talk to Matthew about why his mother left, how long she was going to be gone, or if she would ever return. Before being abandoned by his mother Matthew had an established history of pediatric seizures and required a sleep apnea machine as an infant. Mr. Armstrong's seizures often went without proper treatment or follow-up care. Lacking any parent to take care of him and his brother and sister Mr. Armstrong went to live with his maternal grandparents.

Mr. Armstrong's grandparents, particularly his grandmother, provided the closest thing to a stable living environment that Matthew would enjoy in his life. Matthew's time with his grandmother was good but nevertheless besmirched by his grandfather's physical and emotional abuse. Matthew was frequently physically beaten and locked away in the bathroom or closet following childhood accidents at school. The beatings were known to school staff who mercifully attempted to mitigate the consequences by laundering Matthew's clothes at school. From elementary school to high school Matthew was regularly bullied. In addition to his difficulties Matthew faced socially and medically,  he also performed poorly in school and was in remedial classes. As a result, neither his home nor his school provided any truly safe space for Matthew.

After his grandfather's death, Matthew was raised by his grandmother and his uncles. Unfortunately, one of his uncles was severely mental ill and sought to treat that

illness with narcotics. Mr. Armstrong's other uncle, Michael, due to his physical condition went through an amputation and Mr. Armstrong was charged with caring for him. Poverty in addition to the loss, abandonment, and serious medical conditions permeated Mr. Armstrong's early life. His family was regularly without electricity or water and would have to bathe in a creek near their home. A confluence of these detriments and others also led to Mr. Armstrong being held back in the sixth grade. That truncated history marks the high-water mark of happiness and safety in Mr. Armstrong's life.

Mr. Armstrong's life as a teenager and as a young adult continued the pattern of hardship he had come to expect as normal. Mr. Armstrong's brother was diagnosed and passed away following a cancer diagnosis. Matthew's medical issues also continued to mount. When Matthew was a teenager, he was unable to get a driver's license due to being unable to read. Matthew was diagnosed with diabetes the same year his brother was diagnosed with cancer. Mathew eventually saw his mother again when he was in Ninth Grade, but he would return to his grandmother's care because of issues with his mother's boyfriend. When Matthew was about 13 or 14 years old, his father began writing to him and speaking highly of gang life. Matthew initially wrote back to his father before learning that his father just wanted money from him. At that young age Matthew was forced to realize the parents that he had were never going to be the parents he wanted. Matthew eventually progressed to high school before dropping out.

Deaths in the family coupled with other pressures began to weigh on Matthew. In 2012 his uncle David died and in 2013 his uncle Terry passed away. And in 2015,

Matthew's brother, the person he was closest to succumbed to cancer. The death came as a surprise to Matthew because his brother did not inform him that his cancer had returned. During that time Matthew was also struggling to provide for his new family including his daughters Ania and Neveah, and his son Damien. After his brother's death Matthew, his wife, and his children moved in with his father.

      Matthew's father was never a positive influence in Matthew's life. Matthew sought the comfort of family with his father, but all he found was the Indian Brotherhood, (IBH), prison gang. Matthew did what he thought would impress his father and the IBH to gain some sense of belonging and family. Eventually, that lifestyle is what brings Matthew before the Court and is now set to take him to the BOP for a life sentence. Mr. Armstrong does not contest the life sentence that applies to counts one and three as well as the ten years of imprisonment that applies to count four. Doc. 27, p. 9. In addition, he has waived his right to request a downward variance or departure. Doc. 27, p. 6. Mr. Armstrong adheres to the agreed upon factual basis for his plea agreement. Doc. 27, p.3. United States Sentencing Guidelines Section 2A1.1 applies to Count 1. It is also applicable through the respective sentencing guidelines to counts 3 and 4 by operations of respective cross-references in those guidelines. USSG §§ 2A4.1(c) and 2D1.1(d)(1); Doc. 270, p.1. That birds eye view of Matthew's life replete with poverty, educational deficits, parentally abandonment, and parental substance abuse before this conviction is sadly not uncommon in bringing similarly situated young men to the criminal justice system. The life sentence that Matthew now approaches is also worthy of consideration. What

precisely the future holds for Matthew is unknowable, however, statistics are indicative of what sort of environment awaits.

The BOP is not only a punitive, but a dangerous environment as well. The mortality tables produced by the Bureau of Justice Statistics, (B.J.S.), and the National Center for Health Statistics, (N.C.H.S.), as well as the crime statistics compiled by the Federal Bureau of Investigation, (F.B.I.), support that conclusion. Once those authorities are consulted, it becomes clear that mortality and crime rates within the BOP are all circumstances that are relevant to determining the appropriate sentence. In short, the agreed upon life sentence of incarceration in the BOP acknowledges and reflects the seriousness of the offense, promotes respect for the law, provides a just punishment, affords adequate deterrence, protects the public for the reasons identified below, and is relevant as to why the plea agreement should be enforced.

Comparing the mortality rates of non-incarcerated people in N.C.H.S. table with the mortality rates of incarcerated people in the B.J.S. table the harsh climate of the BOP becomes apparent. The first table provided below, labeled Figure 3, is from the N.C.H.S. which is part of the Center for Disease Control. The table in Figure 3 contains the mortality rates for non-incarcerated people within the United States in 2019. The table in Figure 3 indicates that the average mortality rate for non-incarcerated people like Mr. Armstrong is 69.7 per every 100,000 people.[1]

---

[1] Kenneth D. Kochanek, M.A., Jiaquan Xu, M.D., and Elizabeth Arias, Ph.D., United States Department of Health and Human Services, Centers for Disease Control and Prevention, National Center for Health Statistics, *Mortality Rates in the United States, 2019*, NCHS Data Brief (no. 395) (December 2020), https://www.cdc.gov/nchs/data/databriefs/db395-H.pdf.

Figure 3. Death rates for ages 1 year and over: United States, 2018 and 2019

| Age group (years) | 2018 | 2019 |
|---|---|---|
| 85 and over | 13,450.7 | ¹13,228.6 |
| 75–84 | 4,386.1 | ¹4,308.3 |
| 65–74 | 1,783.3 | ¹1,764.6 |
| 55–64 | 886.7 | 883.3 |
| 45–54 | 395.9 | ¹392.4 |
| 35–44 | 194.7 | ²199.2 |
| 25–34 | 128.8 | 128.8 |
| 15–24 | 70.2 | 69.7 |
| 5–14 | 13.3 | 13.4 |
| 1–4 | 24.0 | 23.3 |

Deaths per 100,000 population (logarithmic scale)

¹Statistically significant decrease in age-specific death rate from 2018 to 2019 ($p < 0.05$).
²Statistically significant increase in age-specific death rate from 2018 to 2019 ($p < 0.05$).
NOTES: Rates are plotted on a logarithmic scale. Access data table for Figure 3 at: https://www.cdc.gov/nchs/data/databriefs/db395-tables-508.pdf#3.
SOURCE: National Center for Health Statistics, National Vital Statistics System, Mortality.

The average mortality rate, in Table 11, is from a report by B.J.S. which is part of the United States Department of Justice. Table 11 contains the mortality rate for inmates incarcerated in federal prisons is 259 for every 100,000 people for 2019.[2] As a result, Mr. Armstrong's chances of death during his incarceration in the BOP are more than doubled.

---

[2] E. Ann Carson, Ph.D., Bureau of Justice Statistics, *Mortality Rates in State and Federal Prisons, 2001-2019-Statistical Tables*, Table 11 (Dec. 2021, NCJ300953), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf.

**TABLE 11**
**Mortality rate per 100,000 federal prisoners, by cause of death, 2001–2019**

| Cause of death | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 220 | 233 | 228 | 210 | 244 | 201 | 222 | 241 | 220 | 224 | 220 | 198 | 230 | 262 | 283 | 252 | 246 | 250 | 259 |
| Illness | 196 | 213 | 217 | 197 | 222 | 188 | 195 | 217 | 198 | 203 | 204 | 182 | 213 | 238 | 249 | 220 | 208 | 190 | 210 |
| AIDS-related[a] | 16 | 12 | 9 | 11 | 17 | 7 | 6 | 8 | 4! | 4! | 2! | 3! | 2! | 0 | 1! | 1! | 4! | 0 | 0 |
| Suicide | 13 | 12 | 4! | 7 | 8 | 7 | 11 | 13 | 12 | 6 | 10 | 11 | 8 | 14 | 12 | 12 | 16 | 19 | 20 |
| Accident[b] | 4! | 3! | 3! | 4! | 4! | 1! | 0 | 4! | 3! | 1! | 1! | 2! | 2! | 1! | 10 | 9 | 5! | 9 | 11 |
| Homicide[c] | 6! | 2! | 3! | 2! | 9 | 5! | 7 | 8 | 4! | 10 | 5! | 3! | 7 | 8 | 10 | 9 | 6 | 8 | 7 |
| Other/unknown | 0 | 3! | 1! | 0 | 0 | 0 | 9 | 1! | 4! | 3! | 1! | 1! | 1! | 0 | 2! | 2! | 11 | 24 | 12 |

Note: Excludes deaths in private federal facilities. Until 2015, federal deaths were submitted as an aggregate count by the Federal Bureau of Prisons (BOP), with limited details regarding cause of death, and excluded deaths in private federal facilities. See table 10 for deaths from 2015 to 2019 in federal prison facilities operated by the BOP or operated privately under a BOP contract. For execution data, see *Capital Punishment, 2019 – Statistical Tables* (NCJ 300381, BJS, June 2021). See *Methodology*. Mortality rates are per 100,000 prisoners held in the custody of the BOP or private prison facilities contracted to the BOP. Mortality rates are based on the annual number of deaths and a 1-day custody population on December 31.
! Interpret with caution. Estimate is based on 10 or fewer cases. See *Interpreting rates among small populations* in *Methodology*.
[a] Includes persons who died of illness and were identified as HIV-positive or having AIDS at the time of death.
[b] Includes deaths due to drug or alcohol intoxication.
[c] Includes homicides committed by other prisoners, incidental to the use of force by staff, and resulting from assaults sustained prior to incarceration.
Source: Bureau of Justice Statistics, National Prisoner Statistics, 2001–2019; and Federal Bureau of Prisons, 2001–2019.

**Table 16**
**Rate: Number of Crimes per 100,000 Inhabitants**
by Population Group, 2019

Data Declaration    Download Excel

| Population group | Violent crime | | Murder and nonnegligent manslaughter | | Rape[1] | | Robbery | | Aggravated assault | | Property crime | | Burglary | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate | Number of offenses known | Rate |
| TOTAL ALL AGENCIES: | 1,081,697 | 387.0 | 14,014 | 5.0 | 122,822 | 44.0 | 237,873 | 85.1 | 706,988 | 253.0 | 5,954,888 | 2,130.3 | 937,367 | 336.7 |
| TOTAL CITIES | 873,689 | 449.2 | 11,039 | 5.7 | 92,472 | 47.6 | 210,769 | 108.4 | 559,409 | 287.7 | 4,847,733 | 2,492.2 | 713,134 | 368.1 |
| GROUP I (250,000 and over) | 430,847 | 715.8 | 5,794 | 9.6 | 35,621 | 59.2 | 121,748 | 202.3 | 267,684 | 444.7 | 1,853,455 | 3,079.4 | 276,877 | 464.4 |
| 1,000,000 and over (Group I subset) | 181,251 | 691.3 | 1,944 | 7.4 | 14,291 | 54.5 | 54,543 | 208.0 | 110,473 | 421.4 | 667,672 | 2,546.7 | 95,427 | 364.0 |
| 500,000 to 999,999 (Group I subset) | 138,815 | 796.3 | 2,184 | 12.5 | 10,518 | 60.3 | 37,942 | 217.6 | 88,171 | 505.8 | 645,353 | 3,701.9 | 97,495 | 577.9 |
| 250,000 to 499,999 (Group I subset) | 110,781 | 669.8 | 1,666 | 10.1 | 10,812 | 65.4 | 29,263 | 176.9 | 69,040 | 417.5 | 540,430 | 3,267.7 | 83,955 | 507.6 |
| GROUP II (100,000 to 249,999) | 139,414 | 451.9 | 1,817 | 5.9 | 14,924 | 48.6 | 33,469 | 108.9 | 89,204 | 289.1 | 834,255 | 2,704.2 | 124,515 | 403.6 |
| GROUP III (50,000 to 99,999) | 106,412 | 333.2 | 1,196 | 3.8 | 12,654 | 39.6 | 24,217 | 75.8 | 68,345 | 214.0 | 706,211 | 2,211.6 | 101,485 | 317.8 |
| GROUP IV (25,000 to 49,999) | 75,729 | 270.5 | 933 | 3.3 | 10,763 | 38.4 | 14,944 | 53.4 | 49,089 | 175.3 | 562,852 | 2,010.4 | 79,048 | 284.1 |
| GROUP V (10,000 to 24,999) | 63,994 | 254.8 | 753 | 3.0 | 9,636 | 38.5 | 10,057 | 40.0 | 43,548 | 173.6 | 489,238 | 1,947.6 | 71,688 | 285.7 |
| GROUP VI (under 10,000) | 57,293 | 310.9 | 546 | 3.0 | 8,874 | 48.3 | 6,334 | 34.4 | 41,539 | 225.4 | 401,722 | 2,180.2 | 59,521 | 323.4 |
| METROPOLITAN COUNTIES | 166,611 | 255.7 | 2,224 | 3.4 | 22,200 | 34.2 | 25,201 | 38.7 | 116,986 | 179.5 | 910,152 | 1,396.9 | 166,581 | 257.1 |
| NONMETROPOLITAN COUNTIES[2] | 41,397 | 208.4 | 751 | 3.8 | 8,150 | 41.1 | 1,903 | 9.6 | 30,593 | 154.0 | 197,003 | 991.6 | 57,652 | 290.3 |
| SUBURBAN AREA[3] | 287,940 | 243.3 | 3,569 | 3.0 | 40,024 | 33.9 | 48,063 | 40.6 | 196,284 | 165.9 | 1,885,710 | 1,593.5 | 295,785 | 251.0 |

[3]

What is equally, if not more concerning, is not only the increased likelihood of death but violent death as well. Table 16 above is the F.B.I. table for violent crimes

---

[3] Criminal Justice Information Services Division, *2019 Crime in the United States*, Tables, Table 16, (2019), https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/table-16.

committed in 2019 indicating a homicide rate of 3.4 in Metropolitan Counties.[4] Table 16 also indicates a homicide rate of 3.0 percent in Suburban Areas and 3.8 percent in Non-Metropolitan Counties.[5] According to Table 11, the mortality rate by homicide for federal inmates in 2019 was 7 in 100,000.[6] That rate is more than double the rate of murder for non-incarcerated people in Metropolitan Counties and Suburban Areas respectively and nearly double the rate for homicides in Non-Metropolitan Counties according to Table 16. Considering those statistics, it becomes patently clear that the agreed upon sentence adequately acknowledges and reflects the seriousness of the offense, promotes respect for the law, provides a just punishment, affords adequate deterrence, protects the public from any crimes of Mr. Armstrong, and the tough conditions of confinement provide further support for honoring the plea agreement.

Additionally, a large proportion of the inmates who died in state and federal prisons between 2001 and 2019 died of illness.[7] Although, one can only speculate as to the percentage of deaths resulting from illness when the COVID-19 pandemic's effects are tallied, it is not an unreasonable prediction that it will not have a salutary effect. For those reasons, the agreement between Mr. Armstrong and the Government to a life sentence in a harsh environment reinforces the contention that this plea agreement is sufficiently punitive to meet the goals of sentencing, but not greater than what is

---

[4] *Id*.
[5] *Id*.
[6] *Id*.
[7] E. Ann Carson, Ph.D., Bureau of Justice Statistics, *Mortality Rates in State and Federal Prisons, 2001-2019-Statistical Tables*, Table 11 (Dec. 2021, NCJ300953), https://bjs.ojp.gov/content/pub/pdf/msfp0119st.pdf

necessary. It is important to note, that subjecting Mr. Armstrong to harm or the risk thereof is not the purpose of this plea agreement in any way whatsoever. Nevertheless, exposure to the risks inherent to incarceration is an unavoidable consequence of operating a penal system. And it is a consequence deserving of critical thought when considering whether the plea in this case adequately meets the goals of sentencing.

## CONCLUSION

For those reasons, this honorable Court should accept the terms of the Rule 11(c)(1)(C) Agreement as being sufficiently punitive to accomplish the goals of sentencing, but not greater than what is necessary when considering the 18 U.S.C. § 3553(a) factors.

Respectfully submitted,

**FEDERAL PUBLIC DEFENDER**
111 Lomas NW, Suite 501
Albuquerque, NM 87102
(505) 346-2489
martin_juarez@fd.org

/s/ filed electronically
MARTIN JUAREZ, AFPD
Attorney for Defendant